Next case on the docket this morning is agenda number 19, number 128867. In re-estate of Mark A. Coffman v. Dorothy Coffman, et al. Counsel for the appellant. Are you ready to proceed? Good morning and may it please the court, David Lieberman and Elizabeth McKillop for petitioners, Peggy Lemaster and Kathleen Martinez. This case is a will contest under the Probate Act. The petitioners brought an action in the probate court asking the court to invalidate the will of their brother Mark Coffman on the grounds that it resulted from undue influence. The probate court erred by failing to apply the longstanding presumption of undue influence in that case. It failed to apply it under both of the tests that are in effect under Illinois law. The first test announced by this court in 1904 in the Weston v. Tuffle case and unchanged really since is that a person standing in a fiduciary relationship with the testator is presumed to have unduly influenced that testator if he or she participates in procuring preparation for execution of that person's will and benefits there under. Under the second test, which is not dependent on the existence of a fiduciary relationship, if a chief beneficiary participates in procuring execution or preparation of a will under which he or she benefits and that testator is debilitated by age or illness, there also is a presumption of undue influence. This court's undue influence doctrine and the presumptions of undue influence are critical safeguards under the policy of Illinois and in reality in effect in every jurisdiction in the country. They provide critical protections to the testamentary freedom of vulnerable testators and the reason for those presumptions historically is that courts after centuries of adjudicating these cases have learned that direct evidence of undue influence is rare. The conduct almost invariably happens in secret and of course in what some scholars have somewhat ingest but have called the worst evidence rule, the testator, the best witness, is dead at the time the matter is litigated. He or she is not there to testify to what his or her true intent was and he's not there to testify to what happened, what the circumstances were in the making of his or her will. There was a trial here of course. What is our standard of review? I'm sorry. There's a trial here? Yes. What is our standard of review? Standard of review is de novo and that is... That's your trial? It is because the issues on appeal before this court are questions of law, pure questions of law. Can the presumptions that you describe be rebutted? It can but we didn't get to that in this case, absolutely. The court made a determination on the threshold analysis whether the presumption applied and determined it did not apply. And I will submit, Your Honor, that the facts on review here are uncontroverted. All of the facts that are the basis for our appeal and our claim of legal error are uncontroverted. And the legal errors that we're asking this court to address are that the probate court and then the appellate court made a legal determination that an agent under a power of attorney for property is not in a fiduciary relationship with the principal. And that is contrary to this court's holdings and every holding in Illinois until this case. Was there any finding in either the trial court or the appellate court that a presumption did not apply because the beneficiary was the attestator's wife of 24 years? Did that play into the analysis? It was referenced but it was not a factor that was cited as a basis for the determination. The probate court did discuss precedent involving spouses and drew distinctions between those cases and this case. But the trial judge did not identify as a factor in refusing to apply the presumption that there was a spousal relationship or the duration of the relationship. Should that factor be considered in the determination of the presumption and whether it applies? It certainly is a factor, as is any fact in the case, one that could be considered. But I think the factor is more relevant to after the presumption applies, can you rebut it? The tests for the presumption are, did the person stand in a fiduciary relationship with the attestator? Now you can't have, not in this case, but you can't have cases where there's a fiduciary relationship in fact and there the spousal relationship most certainly is relevant. We made that argument below. The probate court didn't agree with us that there was a fiduciary in fact relationship. We're not seeking review of that finding here. The only fiduciary relationship that we're complaining about here is the one that was established as a matter of law. So as to that, the spousal relationship we submit is not relevant. So when a, well, go ahead. You're saying it's not relevant when a spouse designates his wife to be with the power of a terror. That that creates a presumption of undue influence. Well, only in connection, if there are other facts. And the critical fact, the fact that this Court in Great House in 1960 and many other cases has said is the critical fact for the presumption to apply is that the beneficiary participates in procuring preparation and execution of the will. That's a pretty unusual circumstance. And certainly this gentleman was dying of, was it esophageal cancer? He couldn't speak, right? He could speak. He had a tracheostomy. He couldn't really be understood on the telephone. And he, I think he also had breathing problems. So that combination made him essentially at that point unable to vocalize so that anyone could hear him on the telephone. And so if he asked his wife to make the phone call to his own lawyer, that raises a presumption of undue influence? Well, I categorically deny that Mr. Hines was his own lawyer. He had never sought any. Forget his own lawyer. He's dying. He can't speak. And he asked his wife to make the phone call to a lawyer. That would be evidence that's relevant to whether the presumption can be rebutted. And it may be a factor in determining whether that person who made the phone call, the spouse in your illustration, whether that person participated in procuring preparation and execution of the will. Of course, here we have many other facts about the involvement. It wasn't just asking to make a phone call. It was asking to make a phone call, asking the lawyer to prepare a will overnight on an emergency basis, telling the lawyer what changes to make to the existing longstanding 2001 will. Specifically, telling the lawyer... Is the record sufficient to make a determination on whether or not his wife participated in procuring the will? I cannot find a case in Illinois that shows participation more overwhelmingly and conclusively than this case. What are the facts that you point to to support participation? Mrs. Kaufman placed the telephone call while Mr. Kaufman was bedridden and in excruciating pain, had just emerged from three days delirium. And in that phone call, she asked the lawyer to prepare a will overnight, told him what terms she and purportedly her husband wanted. That included disinheriting his sisters, for whom he had carved out a specific interest in their family business under the prior will. Only after the wife's death. Everything was left to her, in any event, for her lifetime in trust under the prior will. Called that lawyer, made those requests on an urgent basis. Urged the lawyer to come from Morris, Illinois, to Rush University Medical Center an hour away on the next morning, Saturday morning, to meet Mr. Kaufman in his hospital room where he was bedridden. During the meeting, Mrs. Kaufman did not leave the room. She didn't go to the waiting room or any will. She remained present in the room. She actively... And by the way, the testimony here comes from Mrs. Kaufman herself and from the lawyer, nobody else, and the legal assistant. We didn't have any other witnesses of what went on in the room, but this is uncontroverted. Mrs. Kaufman stayed. She participated actively in the discussions over what the final will terms would be. And she advocated... She again reiterated what she said were her and her husband's wishes. It wasn't just, this is what Mark wants. This is what we want. But she's speaking in the room with the lawyer about what the will terms are. And she advocates for her own interests because the principal changes in this will were to give Mrs. Kaufman outright ownership over this property rather than having it in trust for her benefit for the rest of her life, which already was in place, and in disinheriting Mr. Kaufman's sisters. There weren't other significant changes in the will. And did the trial court make a determination as to whether or not she participated in procuring the will? I don't think so, Justice. And so in that instance, if this court were to determine that the evidence is sufficient to show that, could we affirm the trial court, the appellate court on that basis? That the evidence was sufficient to show that... That she did not participate. It seems to me the place to make that evidentiary finding is in the trial court. The trial court here leapfrogged that question. It didn't actually decide it. It talked about it. So we're not allowed to make a determination and to rule on something that is sufficiently demonstrated in the record, even though it's different than what the trial court or the appellate court did. On the uncontroverted facts here, I believe this court could determine, and would appropriately would determine, that the facts conclusively show participation. If words have meaning, then... So your position is if we're going to find that there was participation, then we don't need to send it back. We can go ahead and enter an order to that effect. But if we were to find that there was not participation, we couldn't do that? I don't think the facts here lend themselves at all. I think it would be against the manifest weight of the evidence to conclude that Mrs. Kaufman did not participate in procuring preparation of this will. The facts are unconstitutional. You did determine that, based on the record, it is within our power to enter a decision based on that affirming the prior court's orders, correct? Based on the uncontroverted facts in the record, it's within the court's power. I submit it would be a manifest injustice. I understand you don't necessarily agree with that, but... Counsel, I have a question. Following up on Justice Rochford's question, you asked the point to the things that suggest that undue influence was being exerted by the wife over the decedent in procuring the will. If the decedent was really in the dire straits that the record suggests, how else would he manage to secure the lawyer coming? First of all, was there any evidence that the decedent was of unsound mind in the court or any other of his doctors, anybody say that he wasn't thinking straight? Was there any evidence to that? Not on the day of the execution, but it's uncontroverted. He was delirious for several days before. Let's just talk about the day of the execution, because practically I'm trying to follow your argument. How would he get a lawyer, assuming that he's entitled to change his will if he wants, how would he get the lawyer to come to the hospital and do all the things that's required to change the will, but for asking his wife to make the phone call? If I could just jump back to your prior point of clarification. Yes, our only claim was undue influence, not lack of capacity. So, yes, the claim is undue influence. But how it could have been. I mean, practically speaking, how would that play out? If he decided he wants to change his will, which he's entitled to do, even to cut his sisters out, which he's entitled to do, how would that practically occur other than what he did here? Easily. He could certainly have asked his wife to make a phone call and asked the lawyer to come visit him. But rather than the lawyer writing the will overnight based on his wife's instructions, the lawyer could have come down to the hospital, met with Mark, we go by first names in this case, no disrespect, just with all the same last names, could have met with him privately, as good estate planning lawyers do, excused everybody else, especially anyone who had an interest in his estate, met with him, interviewed him, asked him all the appropriate questions, including many questions he didn't ask, such as, you have a daughter, what do you want to do for her? And many other questions. And Mark lived six more weeks. Nobody could predict how much longer he was going to live. I'm just trying to practically figure out what the alternative is that you are asserting should have been done to get the will changed in the urgent way that this person, this decedent seemed to want to do because, I guess, nobody could tell how long he was going to live. And I think it was obvious that he was an extremist, right? Well, no, not necessarily. I mean, I don't know what extremist means exactly. He had downgraded quite a bit. He'd been sick for 20 months and he had taken no action to change his will that anybody knows about. But, yes, that was a week where he did decline. But, in fact, what happened was he lived six weeks longer. And I'm wondering, you know, some of the things that you say demonstrate undue influence and that there's rarely direct evidence, but it's often in secrecy. But didn't the decedent's wife tell the sister that, hey, there's a lawyer coming up here, we have to work on our estate plan? Isn't that on March 15th where Dorothy said to the master, the lawyers were coming up to see Mark and they needed to work on their will? Doesn't that sort of directly controvert the secrecy aspect, which is so often part of undue influence? Well, yes, that is part of the record. But we don't know what happened before that. We don't know what discussions there were between Mr. and Mrs. Kauffman before that or after that. We do know that Mark told a palliative care physician, it's in the medical record, that his wife was mad at him because he's been dragging his feet on it. That's all we know. That's all we know about their interactions. And we have Mrs. Kauffman's testimony. But the fact that... And you mentioned the fact that she stayed in the room, but in looking at how things took place, it sounds like she basically was his voice, his way of speaking and communicating. Is that not true? Your Honor, respectfully, that's not true. Mr. Hines, the lawyer, testified that he stood close to Mark and could hear him. He could speak with him. But he had great difficulty speaking and it was difficult to hear him? On the telephone. On the telephone, not in person. So there was an issue in person that led the lawyer to stand very close by so that he could hear him? That's his testimony. And the lawyers that happened were hearing aids and said even with that he could hear him and understand him. That's his testimony. So there's no indication that she was there to assist in making sure that he heard what was being said and those that he was speaking to, that they understood what he was saying in response? Nobody, there's nothing in the record that suggests that. And it's certainly contrary to standard prudent estate planning practice to have a beneficiary in the room as the lawyer discussing the terms of the will with the testator. Nothing suggests that. As a matter of fact, the lawyer said the opposite, that he could understand him and he could speak intelligibly, vocalize intelligibly. That's sort of the, I mean, your argument in looking at all totality of circumstances, just to use that, fill that out, but that's really the kicker in your argument. That's where what is, I'm sorry? That's the kicker in your argument, the fact that she was in the room. Well, Your Honor, to me it is extraordinary that Mrs. Kaufman told the lawyer what terms to put in the will and that he drafted it before he entered Mark's room. Mark is in the hospital. Did he bring three options? Did he bring three different options? Yes, but estate planning is not let's make a deal where you only have doors one, two, and three. And we have an example here in the record of what Mr. Rooks, the prior lawyer, did when he drafted Mark's original will. Well, didn't the lawyer bring three different versions and have a discussion with Mark and Mark just said, no, I don't want this, I don't want this, but I want this. Wasn't that the testimony? With his wife there voicing her own views on the subject. And again, we're not asking. Wasn't there testimony from the lawyer that Mark drove the discussion? The lawyer testified to that. That Mark drove the discussion about what was going to be in the will and which version he wanted. Wasn't that the lawyer's testimony? That was his testimony. But again, we're not asking for a finding that there was undue influence. All we're asking is that the proper analytic legal framework be applied, and that is you apply a presumption when certain factors are present. Those factors were present on the uncontroverted record here. Then there's an opportunity to rebut it. We never got there in this case because of the legal error in determining that there was no fiduciary relationship and in the failure to make a finding whether there was or was not participation in procuring preparation and execution. Thank you very much, counsel. Thank you. Counsel for the appellate. Mr. Howey, may I ask you this question? I'm sorry. Let's introduce yourself. May it please the Court. I am Scott Howey, and I represent the defendant. Respondent in this matter, Mrs. Dorothy Kaufman. So is this a question about our procedural position? That seems to be what counsel is arguing, that this case was directed out, basically, decided on a directed verdict. Is that the idea? There's a bench trial before a judge who heard the plaintiff's case and then at the end of the plaintiff's case decided for the defendant. Is that where our problem is? He seems to be arguing that first there has to be a showing of that he met the burden of showing a presumption, and then only then would the case must go forward beyond a directed fine. Is that where we are? Well, I believe that is, and without putting words in the petitioner's counsel's mouth, I believe that's their concern. That is not a problem on the record of this case, based on what we have the trial judge doing and what the several pages of her ruling that are appended to our brief that reflect her ruling are, what those reflect. It's very clear over some 16 pages of transcript that the trial judge had heard a good deal of testimony, all of it put on through the plaintiff's, through the petitioner's witnesses. The trial judge had heard that testimony, considered it by her own words, examined it, analyzed it, reviewed it, and considered it in the context of the directed verdict motion presented by Dorothy Kaufman's trial lawyers. And at that point, the trial court is clearly evaluating evidence, is weighing evidence, is considering what the meaning and the shape and the development of the evidence meant to the overall question of undue influence. That's exactly as it's supposed to do. And the standard of review in this case, based on that sort of review, is not the de novo standard applicable to a pure question of law. It's manifest weight. Because what the court was doing was to look at the evidence and either to find or to assume for the sake of argument that a prima facie case had been set forward. Counsel, tell us why the trial judge's decision wasn't against the manifest weight of the evidence. It's not against the manifest weight of the evidence because it considers all the evidence, it reviews the evidence to see what its meaning is with respect to the question of undue influence. And before the law can presume that the ordinary influence that spouses are expected to have over each other in the context of a long-term happy marriage has soured into something that is excessive and improper and illegal, there has to be something more shown than simply the ordinary incidence of that kind of a marriage. The court looked, in this case, the trial court looked to the evidence that had been presented on behalf of the petitioner and looked at every aspect, every factor that the case has set forth as relevant to undue influence, looked at the evidence in support of each of those factors and considered whether it was meaningful, whether it said anything about undue influence. It considered, for example, the fiduciary relationship alleged by the petitioners, and it considered the power of attorney. The power of attorney might have some meaning under some factors. It didn't have any meaning here because, in this case, this was a long-term happy marriage. A power of attorney, a dusty old document that typically sits in a safe deposit box somewhere until it is needed, that doesn't have any real meaning or significance to an ordinary, happy, long-term marriage. Most marriages have that, and if they don't, they probably should. It may have some significance in a case like DeHart. DeHart was the case where this court, on the pleadings, found that undue influence had been properly pled, sufficiently pled, in part because there was a power of attorney. In that case, given by a testator to a brand-new wife, someone he had only met mere months before marrying her, the marriage was less than a year old at the time, I believe the power of attorney was executed, that's the sort of thing that might raise eyebrows. That might be a red flag in the context of that relationship. But the court in this case recognized that a power of attorney in a long-term, 24-year marriage, where there is not a shred of evidence that there was contentious, any contention or difficulty or any trouble in this marriage, you won't hear any of that from the plaintiffs and you won't find any of it in the record. In the context of that happy marriage, a power of attorney is next to meaningless. It's perfectly ordinary. It raises no red flags. It raises no eyebrows. And that's the sort of thing that runs through all of the case law with respect to undue influence, especially with respect to the presumption of undue influence in a marriage. What does it mean? What is the evidence that's presented with respect to each of those factors and whether they are the four factors that this court enumerated into heart and has long recognized and so did the petitioners until their reply brief in this case, or whether it's the two-factor version of that test that they now espouse. Either way, all of the factors and the cases that deal with those factors concern whether the evidence in support of those factors has any significance, whether it can be considered meaningful. In the context of a case, for example, like Logosek. Logosek is the Fifth District case that we rely heavily upon. That is a case very similar to this one, a very long-term relationship in which the incidence of the marriage, the sorts of things that might be suspicious in a much shorter marriage or a marriage of convenience or a relationship that is not a marriage at all. Counsel, what's your position regarding whether or not your client helped to procure the new will? My client's participation in the procurement of the will was at best a bit part. It's no different, for example, from the Lemke case, the Fifth District case in which that was not even a marital relationship but a cousin, I believe, who had driven the testator to and from the attorney's office. She had actually retrieved the old will that was being amended from the safe deposit box, had taken a role in doing some of the ordinary physical things that might be necessary, and the court recognized that that was not sufficient. That's not what was meant by the procurement of a will. Those were, as one commentator has described, perfunctory physical activities and didn't go to the actual substance of the will. A good example of a case that did find actual real procurement of a will is the Glugosek case again, and mind you, that is a case that finds Did the trial court make a decision on that, about whether or not your client participated in the procurement of the will? The trial judge seems to have presumed for the sake of argument that that requirement may have been satisfied but then found it not to have any meaning or weight with respect to the overall question of undue influence. It recognized, I believe, it recognized that this was an ordinary part of the relationship between these parties. There's a reason, for example, that the term help meet is an archaic term for spouse. Spouses are known to help each other. It's something that we encourage and expect spouses to do. That was the sense that the trial court had in this case, that that was just part of the perfunctory physical activities that go along with being in a marriage. They're the sorts of things that didn't add up to procurement of the will in the Glugosek case. And it's important to look at Glugosek for that feature because Glugosek found that it was an abuse, it had been against the manifest way to the evidence for the trial court to find a presumption of undue influence. It found in Glugosek, the Fifth District, held that there was evidence of procurement of the will, but it specifically said, explicitly, that the driving the testator to the attorney's office was not what it had in mind, and that did not qualify as procuring of the will. What it did find as procurement of the will was the fact that the wife in that case, the beneficiary, had made a phone call to the attorney not before the will was made, but after. After her husband had met with the attorney and made changes to the will and had corroborated that those were the things that he wanted, the wife contacted the attorney herself, asked for additional changes to be made to the will, and those changes were never corroborated by the testator. And in this case, we have the mirror reverse of that situation. The call to the attorney was made by Dorothy before the attorney met with Mark, before Mark authorized the changes to his will, and most importantly corroborated that they were the things that he wanted to do, including the fact that during the time that this was happening in the hospital room, Dorothy did make a suggestion regarding part of the disposal, and I believe it had tax consequences. I'm not a tax lawyer, forgive me. But Mark overruled her. He took an active role. He did drive the discussion, as was noted earlier this morning during Petitioner's argument. He drove the discussion. He was the one who was taking that active role in procuring the will himself. Any role that Dorothy played in that is distinct from the role that was played and was sufficient to establish procurement in Glogotek. What about her presence? Should we look at that? And that's also not uncommon. I believe that's also the fact of Lemke, where the beneficiary was present in the room. Again, I think that goes to the underlying theme here of whether the evidence that's presented in support of one of these factors is something that has meaning to the question of undue influence, and that's going to depend on the relationship. Given that these are spouses and that one is direly ill, literally on his deathbed, it's not surprising that a spouse would be in the room. The fact that she was present also is enlightened by the fact that she made a suggestion with respect to the will, and Mark chose not to take that. That's a factor that is considerably different from the litany of facts that the petitioners recited this morning. The fact that, and specifically to Your Honor's question, the fact that she is present there pales in comparison to the fact that Mark is able to assert his own wishes, including when those wishes diverged from her request. And so to suggest that the notion of undue influence should be presumed here and that it might be against the manifest way to the evidence to find, as the trial court did, that it wasn't satisfied, that's not consistent with the record. It's not consistent with the facts. So what kind of language do you suggest an opinion should include to reflect the arguments that you're making about the analysis of undue influence in a long-term marriage? What do you suggest in the court say about that? I think this court should say exactly what it said in DeHart. In DeHart, it cautioned that caution is necessary. It spoke very clearly and agreed, expressly agreed, with the Glugovsek court, which came up with the language, that in the context of the marital setting, the presumption of undue influence should be applied only with great caution. I would add only that it should be applied rarely, and only when the evidence that supports the factors allegedly in support of undue influence are somehow related to the notion of undue influence, when they are inconsistent with what else is known about the relationship. If what we know about a relationship is that the parties don't know each other very well and that there are reasons to suspect that one person is helping the other out of some sort of self-serving, deceptive motive, when those are the facts, then something like a power of attorney means something. It has significance. So to Your Honor's question, I think I can make your job very easy. You can cite DeHart. You can rely on the language in DeHart that not only talks about the caution that's necessary in applying this in the marital setting, but also the fact that it's a case-by-case determination, and that it has to turn upon the knowledge and the understanding and the evidence of what the relationship is otherwise like. In a case like Glagovsek, for example, to bring that one up again, the court recognized that, and bear in mind, that court found that there was evidence that the beneficiary had participated in the procurement by making that phone call afterward and having things added to the will that were not corroborated by the decedent. But that court found that even despite finding that the beneficiary had participated in the procurement of the will, that was less ominous because of the other factors, the fact that there was not the sort of dominance and dependence, that the wife had not been shown to dominate the decedent, in a way that might make the procurement of the will more significant, more ominous, to use the phrasing of the Glagovsek court. It's important to bear in mind that undue influence is the issue here, and it is the brass ring that the petitioners are trying to achieve. It's not a checklist. It's not just a list of things that have to be checked off, and if we have each of these four things, then we have a presumption. What all the cases recognize is that these factors have meaning. At least they're supposed to have meaning if they're going to have the enormous effect of turning the most precious aspects of a marriage into the most damning evidence in a will contest. That's not what the courts have intended to do. It's not what this court, if I may venture to say, had in mind when it decided to heart and found that the power of attorney and the things that the beneficiary had done had some significance, had some meaning, raised their eyebrows, raised red flags. Those were things that in the context of what was known about the relationship had a significance and contributed to the question of undue influence. Nobody just checked off boxes, and yet I believe that is what the petitioners are asking this court to do, to apply a rigid formulation to the question of undue influence, even in the context of a long-term, 24-year happy marriage, and to say that if these boxes are checked off and if we can establish an unused power of attorney, well, that checks off the box of fiduciary relationship. And by the way, that also checks off the next two factors because those are things that are presumed to be part of a fiduciary relationship, the dominance and dependence, which haven't been shown in this case, the trust and confidence, which, my God, is exactly what we expect spouses to show for one another, the procurement of the will by making a phone call. What on behalf of someone who couldn't make a phone call himself? These are all factors that have to be considered in the context of the undue influence theory and not merely as just their own factors independent of each other without relation to each other or without relation to the bigger question of whether that undue influence can not only be found but presumed. And I ask the Court to consider as well and find a way to include it in your opinion that the notion of presuming a spouse to be guilty of undue influence, to be guilty of influence that is, as the cases call it, excessive, improper, illegal, presuming a spouse to be guilty of that for having done the things that we expect and encourage spouses to do in a happy marriage, that is unthinkable. That's an unthinkable way to think about marriage in this state. Imagine the corrosive effect on estate planning if spouses have to now be told that the person they trust most in the world may become a person of suspicion because of that very trust. Again, I venture to say that's not what this Court had in mind when it talked about applying the presumption of undue influence with caution when it said that into heart. It's not what the Court was thinking of, I venture to say, when it spoke of applying the presumption and considering each case on its own merits, on its own facts. Petitioners have some disputes as to what happened, but the Court heard all of that evidence. It heard the best evidence the petitioners could muster. It weighed that evidence. It compared the factors. It considered them in the context of what they meant, what significance they had to the overall question of undue influence. And it concluded that they didn't meet that test. They didn't meet those requirements. And the directed verdict in favor of Dorothy Kaufman was appropriate on that basis. It was perfectly consistent with the manifest weight of the evidence. And it should be affirmed. Thank you very much, Counsel. Mr. Butler. The appellate court's decision in this case, the respondent is asking you to affirm, announces a radical change in the undue influence doctrine. This Court has applied certainly since Weston v. Tuffle in 1904 and even before. The result in this case is a radical erosion of the presumption of undue influence that is so essential to protecting vulnerable testators. There is no argument that caution should be applied in marriages. But there has never been a case in Illinois or any jurisdiction until now that says a power of attorney for property does not give rise to a fiduciary relationship as a matter of law. And now counsel is advocating some kind of squishy analysis about how long it's been in the drawer and who holds it and how routine it is. If an agent holds your power of attorney, they can walk into a bank, withdraw all your funds, they can sign contracts for you, as Mrs. Kaufman did in this case. What it bespeaks is enormous trust and confidence. And the presumption of undue influence has been applied in this state and in every state where there is a special relationship of trust and confidence and the critical factor that is ignored in this case by the respondent, and that is procurement. And the procurement facts in this case are nothing like Lemke, which counsel cited. In Lemke, the court found – first of all, it didn't even find that there was no participation in procurement. It found that the respondent did not cause the preparation. But in that case, it said the respondent didn't urge making of a new will, didn't comment on the terms, diametrically opposed from what happened in this case. At the end of the petitioner's case, should the court take into consideration the totality of the circumstances? It should take into account the totality of the circumstances and determine first – and again, our complaint here is not that the court didn't find undue influence. Our complaint is that it didn't analyze the question with the proper legal framework, and it's going to wreak havoc in cases throughout the state from here on if this court doesn't correct it. So what you're saying, in every single case, an undue influence, first the petitioner has an opportunity to put on evidence to whether or not the presumptions have been created, and then there must be a denial of a motion projected by a verdict, and there must be a second half of the trial where all of the other circumstances that we've been talking about are introduced. Is that the only way that a trial court should hear a case of undue influence? There could be actual evidence, direct evidence, although that's very rare. But the first question, the threshold question under this court's jurisprudence, has always been, if the petitioner makes the claim, that there is a presumption of undue influence. And that's a very simple test, and it's a straightforward test. I understand, but I really see this as a procedural problem. You've got – the issue is before the court, presented lots and lots of evidence, and the court at the end of the day found no undue influence at the end of your case by directing a verdict on your petition. So wasn't the trial court hearing everything and ultimately found that you had not carried your burden? Isn't that what happened here? What the trial court didn't do was analyze it correctly because it didn't put Mrs. Kaufman to her burden to rebut it by clear and convincing evidence. And that's the error. It didn't analyze this case with the correct legal framework that this court has laid down for 100 years. So there has to be a final presumption, and then at the end of the petitioner's case, then either judgment granted for the petitioner or the trial must go on. The court cannot hear all of the evidence, the totality of the evidence, in the petitioner's case. Theoretically, it could make a determination at the end of the petitioner's case that the evidence had been rebutted. You never know what a witness is going to say in your case. It could have made that determination. The presumption, I find the presumption applies, but I find it's rebutted. It could do that. That's not what the court did here. It said, I don't find the presumption because I don't find that a power of attorney gives rise to a fiduciary relationship. That's never been the law in Illinois, and it should not be the law starting with this case. And I will submit that I agree with counsel that what the court said in DeHart is as far as it should go on the marital caution point, because this court or no court should be in the business of making abstract judgments about marriages based on duration or circumstances. And, unfortunately, there are – Counsel, other than that statement, is there anything in the record that supports the trial court's finding? Is there anything? Well, does the record support the trial court's – I know what your argument is, but is there enough in the record that we could look at that supports the trial court's finding other than your comment that the trial court is saying that changing the law, in your view, that the wife is a fiduciary and, therefore, just by that term, she can't – she must be exerting undue influence? I mean, that's kind of what you're saying. The only finding the trial court made in this case is that petitioners had not met their burden to establish a presumption of undue influence. That's as far as it went. Right, but can we find – we can affirm on anything that the trial court looked at in the record to come to that conclusion. So I'm asking you, are you saying there's nothing in the record that supports the trial court's finding? There's testimony from Mrs. Coffman that she was only doing what Mark wanted. Is that enough? I would submit no under the case legislate that the – Donnie's testimony about what – Wasn't there also testimony from the attorney that, in his view, Mark was driving the discussion about the will and making his own choices about what provisions he wanted and so on? He said that, and the only place he said it was on this point about whether there'd be some money put in trust to save the Illinois – avoid Illinois estate tax or minimize Illinois estate tax. And I'll read to you from counsel's memo, which was Exhibit 17. I don't have the exact record site. He said, Dorothy initially wanted the total outright distribution to her, but Mark immediately recognized the importance of not paying any estate taxes at his debt. And, by the way, that was counsel's recommendation. So all Mark was doing was going along with counsel's recommendation there, which counsel – Does that indicate he was competent? I'm sorry, Judge. I said, does the fact that he was concerned about his taxes indicate that he was competent and therefore had testamentary capacity? We're not arguing testamentary – yes. We're not arguing that he didn't have testamentary capacity. We're arguing that he was unduly influenced. But if he was competent and if he was making decisions about what he wanted, then must we come to the conclusion he was unduly influenced? I think the Court must come to the conclusion that the trial court was required to presume unduly influence and to put Mrs. Kaufman to her burden to overcome it. And we never got there in this case. Even if – even if the testator was competent and knew what he was doing, made decisions about his own will? Well, he knew what he was doing. We do not believe he made his own decisions. And that, I will submit again, is the issue. First of all, what the counsel wrote is, on this tax point, Dorothy acquiesced to the concept of the family trust. The key was the fact Dorothy could, through her estate plan, direct the distribution of all assets. Counsel, what we're going to be doing, though, is reviewing all of the evidence to see whether or not the trial court's decision was against the manifest weight of the evidence. So we're going to take all of that into consideration. I submit that is not the question. The question is the – just the legal framework that the trial court applied. Is it correct or incorrect? It is manifestly incorrect. But we're reviewing the trial court's judgment. The trial court didn't reach the question that needs to be reached in this case, and that is, has Mrs. Kaufman or can Mrs. Kaufman, when she puts on her own case, rebut the mandatory presumption of undue influence? But the court made a decision. It was unnecessary for her to put on her case. Because it didn't find the presumption. Because she had sufficient evidence that the testator was competent and entered a judgment for the defendant. Competency was not challenged or contested or the basis. Again, the only basis for the objection to the will was that Mr. Kaufman was unduly influenced. And, again, I will submit that the issue is not whether Mrs. Kaufman acted illegally or anything of that nature. The only issue is whether this will reflects Mr. Kaufman's testamentary intent. That hasn't been decided. Thank you very much, counsel. This case, agenda number 19, number 128867, in re-estate of Martha Kaufman v. Dorothy Kaufman, will be taken under advisory.